IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Laura Phieffer, MD,** | : | |
| | : | |
| Plaintiff, | : | Case No. 2:25-cv-1225 |
| | : | |
| v. | : | Judge |
| | : | |
| **The Ohio State University,** | : | Magistrate Judge |
| | : | |
| and | : | |
| | : | |
| **Andrew Glassman, MD**, Chair of the Department of Orthopaedics, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**
**(Jury Demand Endorsed Hereon)**

I. **INTRODUCTION**

1. This is an action for compensatory and punitive damages, as well as injunctive relief, arising from a series of acts of sex discrimination and retaliation by Defendants The Ohio State University ("OSU") and Chair of the Department of Orthopaedics, Andrew Glassman, in violation of Title IX of the Education Amendments of 1972, the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §1983.

2. Defendant Glassman engaged in sex discrimination toward the Plaintiff, Dr. Laura Phieffer, former Chief of the Division of Orthopaedic Trauma, and retaliated against her, after Dr. Phieffer advocated for the hiring of Lisa Cannada, MD, following Dr. Cannada's application for a position in the Orthopaedic Trauma Division at Defendant OSU. Because Dr. Cannada had filed a sexual harassment complaint as a mandatory reporter for her female orthopaedic surgery trainees while working at Saint Louis

1

University (SLU) and its associated Mercy Hospital, the Plaintiff cautioned Defendant Glassman about relying solely on references from SLU/Mercy Hospital. During the interviewing process for Dr. Cannada, Defendant Glassman labeled Dr. Cannada "a very polarizing individual who has generated considerable controversy" because of her complaints of sexual harassment toward female trainees at her former employer. Disregarding Plaintiff Phieffer's warnings, Defendant Glassman relied on questionable references, including one from an SLU surgeon who had never worked with Dr. Cannada.

3. During and after the recruiting process that led to Dr. Cannada's consideration for employment at Defendant OSU with Dr. Phieffer's strong support, Defendant Glassman began a multi-year effort to damage the Plaintiff's personal well-being and professional reputation through acts including: publicly stationing armed security outside of a conference to discuss her position as Chief of the Trauma Division; facilitating false reports of petitions signed by her colleagues in the Department Orthopaedics for her removal; knowingly disseminating false information to outside reviewers about Dr. Phieffer's performance as Chief of the Trauma Division; and insisting on an unjustified and unnecessary hiring of a male Orthopaedic Trauma surgeon, knowing it would significantly and adversely impact the Plaintiff's income, but not that of her peers.

4. On November 13, 2024, Defendant Glassman removed Dr. Phieffer as Chief of the Division of Orthopaedic Trauma. Dr. Phieffer successfully performed the duties of Chief for 14 years, which added to her stellar reputation as an Orthopaedic Trauma surgeon and a leader in her profession.  The Defendant appointed a male orthopaedic

2

surgeon to replace Dr. Phieffer. As noted above, Dr. Glassman insisted upon that surgeon's hiring despite opposition from Dr. Phieffer and other trauma surgeons. The new surgeon hired and later appointed to replace Dr. Phieffer as Chief was not qualified to perform most of the complex surgeries undertaken by the Division's surgeons. When the Plaintiff informed Dr. Glassman that she believed he was removing her because she was a woman, he warned her against making such statements. Defendant Glassman continues his endeavors to harm the Plaintiff's personal and professional life, damage her reputation, and diminish her compensation in an attempt to compel her to leave the university.

## II. JURISDICTION AND VENUE

5. This court has federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, this being an action pursuant to 42 U.S.C. §§ 1983, 20 U.S.C. §§ 1681-1688, and the United States Constitution.

6. At all relevant times, the parties resided and conducted business, and the events herein took place, in Franklin County, within the Southern District of Ohio, Eastern Division.

## III. PARTIES

7. Defendant OSU is a public university and a political subdivision of the State of Ohio. It is an employer with over 40,000 employees. Among many other entities within OSU, the University includes the Ohio State Wexner Medical Center, a Level I trauma hospital that has a Department of Orthopaedics containing eleven divisions, including the Orthopaedic Trauma Division. Its main campus and hospital facilities are located in Columbus, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division.

8. Defendant Glassman is the Chair of Defendant OSU's Department of Orthopaedics. At all material times, Defendant Glassman has had authority to make, implement, and execute university academic, personnel, and clinical policy affecting the faculty and staff of the Department of Orthopaedics, including the Plaintiff. Defendant Glassman is a resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division. He is sued in his personal capacity.

9. Plaintiff is a female resident of Franklin County, Ohio, within the jurisdiction of the Southern District of Ohio, Eastern Division.

10. The actions of the Defendants and their agents and employees were within the scope of their employment and undertaken with malice and knowing disregard for the Plaintiff's rights under clearly established federal law. At all relevant times, the Defendants and their agents and employees acted in concert with each other to discriminate and retaliate against Dr. Phieffer.

## IV. FACTS

11. Plaintiff has been an Orthopaedic Trauma Surgeon for Defendant OSU since 2003.

12. Plaintiff was the head of the Orthopaedic Residency Program at Defendant OSU for three years, from July 2006 through September 2009.

13. Plaintiff was the Medical Student Clerkship Director for four years, from July 2005 through September 2009.

14. During Plaintiff's tenure at Defendant OSU, she has worked under four different Chairs for the Department of Orthopaedics.

4

15. During 2010, Plaintiff was promoted to the position of Division Chief of Orthopaedic Trauma. Plaintiff was also promoted to Associate Professor during 2010. She was promoted to full Professor in 2020.

16. During 2011, Defendant OSU's leadership asked Dr. Phieffer to assume the role of Medical Director of Perioperative Services because of her background and reputation as an exemplary, effective, and efficient surgeon. Dr. Phieffer made Defendant OSU's operating rooms more efficient and effective. In fact, Dr. Phieffer led a team that reported the results of their efforts in an article, for which she was lead author, published in the Journal of Health Care Quality in 2016. The results demonstrated that OSU's hospitals were best in class nationally.

17. In 2016, Dr. Phieffer was honored with OSU's Office of Diversity and Inclusion's Shining Star Award, which recognizes one member of the faculty each year for their work advocating for greater diversity and equal opportunity.

18. During 2018, Defendant OSU nominated Dr. Phieffer for the Hedwig van Ameringen Executive Leadership in Academic Medicine ("ELAM") Program at Drexel University. The ELAM program was specially developed for experienced women faculty who demonstrate the greatest potential for assuming executive leadership positions. Following OSU's nomination, Dr. Phieffer successfully completed a multi-stage nationwide competitive selection process and was selected to participate in the 2019-2020 ELAM Program.

19. Plaintiff's Health Care Grade is consistently a 5 out of 5. She has also been listed as a "Top Doctor in Ohio" and "Best Doctor in America" annually since 2007. Defendant

5

OSU's hospital management routinely calls upon Dr. Phieffer when a VIP is in need of Orthopaedic trauma surgical care.

20. Dr. Phieffer's annual reviews from all three of her prior department chairs and hospital leadership over the course of her career at Defendant OSU have been excellent. She also had very positive performance evaluations from Defendant Glassman from 2014-2019, and her 2020 performance evaluation was entirely positive until Defendant Glassman altered it in 2021, when Dr. Phieffer advocated in favor of Dr. Lisa Cannada's potential employment.

21. Beginning in late 2020 and continuing into 2021, the Division of Orthopaedic Trauma needed and started a search for a new orthopaedic trauma surgeon specializing in Level 1 Trauma, including pelvic and acetabular injuries. As Division Chief, the Plaintiff led the search committee.

22. One of the individuals applying for the position, Dr. Lisa Cannada, previously worked at Saint Louis University ("SLU") and Mercy Hospital, its associated hospital. Dr. Phieffer warned Defendant Glassman that references from SLU-affiliated hospitals could be adversely impacted by the fact that Dr. Cannada, a mandatory reporter, had filed a sexual harassment complaint while at SLU on behalf of female residents. Notably, Dr. Cannada had also worked at hospitals not associated with SLU. To the Plaintiff's knowledge, Defendant Glassman made no effort to obtain references from those other hospitals.

23. Prior to learning of Dr. Cannada's protected activity, Defendant Glassman spoke favorably to Plaintiff about the strength of her resume. But in an email chain initiated by Dr. Glassman to the search committee on June 6, 2021, he stated, "an impartial

6

observer would agree that Dr. Cannada is a very polarizing individual who has generated considerable controversy." In his emails, Defendant Glassman highlighted three negative references from surgeons, one of whom had never worked with Dr. Cannada at all. The other two negative references were individuals who worked with her at the institutions that were the subject of sexual harassment charges made by Dr. Cannada.

24. Though Defendant Glassman had been advised of two glowing references from nationally known orthopaedic surgeons familiar with Dr. Cannada's work, the Defendant did not discuss either of the references with Committee. One such reference was from Dr. Michael Suk, the Chair of the Geisinger Health System Department of Orthopedics, who himself had hoped to hire Dr. Cannada. Dr. Suk's reference made it clear that Dr. Cannada was being blacklisted, and people were intentionally sabotaging her career.

25. Despite these strong favorable letters, Defendant Glassman made no effort to reach other former colleagues at the other institutions at which Dr. Cannada had practiced. Instead, Defendant Glassman made it clear he had serious concerns regarding hiring her. Dr. Phieffer questioned his concerns and cautioned Defendant Glassman that Dr. Cannada's opposition to sexual harassment should not preclude her hiring. Dr. Phieffer also told Defendant Glassman that "[t]he feedback from the faculty at SLU is also tainted due [to] the circumstances that led that program to come under scrutiny."

26. Despite the Plaintiff's continued support for Dr. Cannada's consideration for the open Trauma Division position, Defendant Glassman would not consider Dr. Cannada or

7

support her hire. Ultimately, Dr. Cannada was removed as a candidate for consideration when the search committee subsequently met to review additional candidates.

27. Following Dr. Phieffer's questioning of his handling of and comments concerning Dr. Cannada's application, Defendant Glassman began a lengthy, continuing campaign to sabotage Dr. Phieffer's employment by undermining her authority, disrupting her professional relationships with colleagues and staff, and misrepresenting her performance as a physician and Division Chief of Orthopaedic Trauma.

28. On June 7, 2021, Defendant Glassman met with a select group of Orthopaedic faculty, exclusive of any Trauma Division faculty, to advise them he was planning to remove Plaintiff as Chief of the Trauma Division.  None of those invited had any direct role in supervising or evaluating the Plaintiff. During the meeting with the group, Dr. Glassman shared knowingly misleading and inaccurate reasons for removing the Plaintiff.  These included contrived concerns regarding her supposed lack of collegiality, condescending attitude, and intimidation of residents and staff, including Dr. Thuan Ly, a surgeon in the Orthopaedics department. In addition to misleading information shared at the meeting regarding the preceding topics, Defendant Glassman made knowingly false statements to the faculty regarding the alleged lack of growth caused by extremely high turnover in the Trauma Division during Plaintiff's tenure.

29. On June 8, 2021, Plaintiff received a phone call from Dr. Bishop, the Department's Shoulder Division Chief. Dr. Khan, the Spine Division chief, was also on the call. During the call, Dr. Bishop informed Plaintiff that there had been a meeting with Dr. Glassman on the previous day, June 7, 2021, at which Dr. Glassman announced that he

8

intended to remove the Plaintiff as Trauma Division chief, and the faculty in attendance had issued a "vote" of no confidence.

30. Dr. Bishop told Plaintiff that the purpose of the June 8 call was to offer her the opportunity for her to step down in advance to avoid the embarrassment of a public announcement of her removal. Dr. Bishop also claimed in this call that the dean would be sending her a letter with the reasons. In fact, no such written ballot or other form of voting occurred at the June 7, 2021, meeting. Nor did Dr. Phieffer ever receive a letter from the dean with the reasons for her upcoming removal as Division Chief.

31. After receiving the communications about plans for her removal as Trauma Division chief, Dr. Phieffer raised concerns and questions to Defendant Glassman about being asked to step down as chief. Dr. Glassman confirmed his desire for her to step down as chief. When she made it clear to him that she believed she was being targeted because of her gender, Defendant Glassman warned her, "Be very careful about that."

32. Defendant Glassman met with Dr. Phieffer on September 2, 2020, to discuss his assessment of her performance during the preceding contract year. The signed version of Defendant Glassman's review is dated September 9, 2020. It was produced at the Plaintiff's request later by the Defendants in 2021, as she was not given a copy at the time of the review.

33. While the 2020 review produced to Dr. Phieffer by the Defendants in 2021 contained the kind of consistent praise reflected in past yearly reviews by her 3 prior chairs and Defendant Glassman, this newly revised review of Dr. Phieffer contained critical, incomplete, and inaccurate commentary that was not included in Plaintiff's actual 2020 review nor discussed during the September 2020 review meeting. Surprised by the new

adverse and inaccurate content contained in the review produced in 2021, Dr. Phieffer was able to determine that Defendant Glassman had made changes to the review letter on June 15, 2021. While he disputed the extent of the changes, Defendant Glassman admitted to OSU investigators in its Office of Institutional Equity (OIE) that he had done a "correction" of the September 2020 review in June of 2021.

34. In the altered 2020 review Dr. Phieffer received in 2021, Dr. Glassman threatened Dr. Phieffer about making accusations of gender bias, stating, "I would urge you to be more circumspect when invoking gender bias as the root cause of a suboptimal outcome or a legitimate difference of opinion."

35. The content of the 2021-produced version of Dr. Phieffer's 2020 review also included Dr. Glassman's false assertion that he was disappointed with a purported conflict between Dr. Ly and the Plaintiff.

36. In fact, as demonstrated by documented evidence, Dr. Ly was the subject of extensive complaints and concerns from numerous residents reported to the Orthopaedic Surgery Residency Program Director, Dr. Scharschmidt. Because of the number and seriousness of the complaints, Dr. Scharschmidt alerted Defendant Glassman to the situation. Defendant Glassman participated with Dr. Phieffer and the Program Director in approving a performance improvement plan developed by Dr. Phieffer for Dr. Ly. Both Defendant Glassman and Dr. Scharschmidt complimented the Plaintiff for the plan.

37. However, in discussing the altered 2020 review of Dr. Phieffer, Defendant Glassman told OIE investigators that he had received complaints from Dr. Ly accusing the Plaintiff of fabricating resident complaints, and that he was disappointed with the

conflict with Dr. Ly, blaming Plaintiff for his departure, which Dr. Glassman now claims was a great loss.

38. Defendant Glassman never informed OIE investigators of the numerous and serious resident complaints about Dr. Ly's conduct. Nor did he advise the OIE investigators of his agreement and approval of a Performance Improvement Plan for Dr. Ly.

39. Notably, Dr. Glassman's review of Dr. Phieffer, even as altered in 2021, referenced and complimented the excellent resident reviews for the Plaintiff's teaching. Defendant Glassman, however, told OIE investigators that Dr. Phieffer had concerning resident reviews. Other witnesses critical of the Plaintiff repeated Dr. Glassman's knowingly false statements. For example, Dr. Bishop represented to OIE investigators that Dr. Phieffer's resident reviews were "terrible". The actual reviews, which were provided to OIE, were in fact very positive.

40. In 2021, the Department of Orthopaedics initiated preparation for an outside review to evaluate the department and its divisions and provide recommendations concerning its organization, leadership, and any other matters related to improving its services, economics and patient care.

41. On October 14, 2022, Dr. Phieffer notified Defendant Glassman in writing that he was making false representations about her performance as Division Chief, especially as it related to purported high turnover in the Trauma Division and lack of growth compared to other Divisions. In fact, as documented from the Department's own records for the eleven Orthopaedic divisions, Defendant Glassman **underreported t**he physician departures in five of the divisions. In contrast, Defendant Glassman **overreported** the number of physician departures from the Trauma Division during the Plaintiff's tenure

11

as Chief. Defendant Glassman omitted the fact that he had struggled with recruitment and retention during his years as Chair, losing more than half of the faculty that he was able to recruit. The departures included three of the five faculty members recruited into Defendant Glassman's own subspecialty of total joint replacement.

42. On or about November 23, 2022, Dr. Carmen Quatman, a physician within the Trauma Division, notified Dean Carol Bradford that the information regarding turnover in the Trauma Division reported to the external review committee was incorrect. To Plaintiff's knowledge, no action was taken to correct the false information provided to the external review committee and the faculty.

43. During December 2022, the Plaintiff was asked by Dr. Scharschmidt, the Residency Program Director, to speak to two senior male residents regarding concerns they had about Dr. Angela Collins, who, at the time, had been at OSU less than four months. Dr. Phieffer met with the residents. During her meeting with the male residents, the Plaintiff quickly observed their concerns were broad and lacked any substance. Other than telling the Plaintiff they did not think Dr. Collins was a good surgeon, the two residents provided no details or examples. Nonetheless, Dr. Phieffer assured the residents she would continue to monitor Dr. Collins's practice, as she does for all new faculty, and then meet with them again. The Plaintiff also reminded them of the daily morning Orthopaedics Trauma conference, where all scheduled surgeries are reviewed.

44. Despite Dr. Phieffer's assurance and promised follow-up, the two senior male residents went to Defendant Glassman regarding their opinions about the surgical practice of Dr. Collins. Without contacting Dr. Phieffer, Dr. Collins's Division Chief, or Dr. Carmen Quatman, the Vice Chair of Quality for the entire Orthopaedic Department, who is

responsible for reviewing such complaints, Dr. Glassman directed the two senior male residents to provide a list of their concerns about Dr. Collins.

45. Notably, Defendant Glassman knew when the residents approached him that the Trauma Division holds daily morning meetings at which the members of the division discuss the surgical plans for all patients that day. Residents attend these sessions. Like the other surgeons, Dr. Collins went over her surgeries and her planned approach and techniques for each. The Division members discussed each surgery plan, made suggestions, and approved when the plan was finalized. During the morning sessions, all resident questions about any of the surgery plans were addressed.

46. Without personally reviewing or validating any of the items on the residents' list and letter of concerns submitted to him, Defendant Glassman escalated the residents' complaints to the Chief Medical Officer of the Hospital, Dr. Naeem Ali. To the Plaintiff's knowledge, the Defendant had never bypassed surgery practice issues being reviewed by the Department Vice Chair of Quality and the applicable Division chief when male surgeons were involved. Ultimately, the accusations were determined to be unfounded. But Dr. Collins was forced to endure an extended, unjustified competency evaluation not applied to any male peers about whom complaints were raised.

47. Sometime before February 2, 2023, Dr. Glassman received from the Dean of the OSU College of Medicine a draft document entitled, "Department Action Plan – External Review," concerning Defendant OSU's Orthopaedic Department. The plan was not supposed to be circulated among the Orthopaedic Department's faculty and administrators until further review by the Dean at a leadership meeting set for February 10, 2023. Nevertheless, on February 2, 2023, Defendant Glassman emailed the draft

action plan to the Orthopaedic Department's executive committee, which included many department members. The email from Defendant Glassman had an attachment containing the draft action plan recommending Plaintiff's removal as Trauma Division Chief. This was documented proof that Dr. Glassman provided false statistics regarding turnover rates in the Department, as described above, to the External Review Committee.

48. Dr. Phieffer was a member of the executive committee at the time. Shortly after Defendant Glassman had sent his email to the executive committee, he sent Dr. Phieffer a text message stating that she had received "an email with an incorrect action plan discussing your replacement as chief of trauma."

49. During early 2023, Defendant OSU engaged in the recruitment of an additional pelvis/acetabulum trained orthopedic trauma surgeon. Once again, Dr. Phieffer, still serving as Division Chief, led the Trauma Division's search committee.

50. During this recruitment effort, Defendant Glassman refused to hire a pelvic/acetabular trauma surgeon, the specialty skill sets the Division needed and posted for. Instead, he insisted on hiring Dr. Ryan Harrison, who had been practicing only general orthopaedic surgery since graduating from his trauma fellowship in 2013. Defendant Glassman demanded despite knowing that Dr. Harrison had not practiced the orthopaedic trauma subspecialty work in 10 years. Dr. Harrison was not qualified to perform pelvic/acetabular trauma surgery.

51. Defendant Glassman knew that Dr. Harrison was not qualified to do pelvic/acetabular trauma surgery, which was the area of practice needed to better meet the Division's

patients' needs. Dr. Phieffer told Defendant Glassman that Dr. Harrison was not a necessary or appropriate hire.

52. Ultimately, Defendant Glassman said he would agree to hire Dr. Humza Shaikh, a pelvic/acetabular surgeon, but only if the Plaintiff and her Division acquiesced in Dr. Glassman's demand that Dr. Harrison be hired as well. Because of the importance of adding Dr. Shaikh to the Division's medical team, the Plaintiff and the search committee agreed to hire both. OSU hired both of them in October 2023.

53. Before the forced agreement to hire Dr. Harrison was reached, the Plaintiff reminded Defendant Glassman of the financial issues that had occurred previously when there were two surgeons hired in one year. Specifically, OSU's trauma volume does not support the hiring of two surgeons in one year.

54. The efforts of the Plaintiff and multiple female peers to address the discrimination, retaliation, and hostile work environment they were experiencing within OSU have been unsuccessful.

55. The Plaintiff, Dr. Collins, and Dr. Quatman filed an internal complaint with OIE in July 2023. Despite a review process that took nearly a year, OIE failed to conduct a legitimate investigation or remedy the female employees' concerns.

56. Instead, OIE took virtually every statement of Defendant Glassman at face value, including his claims that he had not called Dr. Cannada a "polarizing" applicant, that turnover in the Plaintiff's division was higher than in other divisions, and that the Plaintiff was the subject of unusually negative resident reviews and peer complaints, each of which was demonstrably false and contradicted by indisputable documentary evidence collected during OIE's investigation.

57. In a meeting on November 13, 2024, Defendant Glassman removed Plaintiff as Chief of the Trauma Division. Also in the meeting were Administrator Mike O'Brien, Emergency Medicine Department Chair Dr. Jeff Caterino, and Secretary Olivia Pabisinski. Continuing his mission to push Plaintiff out of her employment by suggesting she was a risk to others, Defendant Glassman stationed an armed security guard outside the meeting room door knowing that others would see or know of the security guard's presence.

58. Defendant Glassman then replaced Dr. Phieffer as Chief of the Trauma Division with Dr. Harrison, who is not qualified for the position. Dr. Phieffer now reports to Dr. Harrison, who most recently practiced only general orthopedic surgery. Dr. Phieffer is considerably more qualified than Dr. Harrison, given her years of practice as an Orthopaedic Trauma Surgeon and her prior leadership roles within Defendant OSU.

59. Dr. Phieffer's removal as Chief of the Trauma Division has marred her professional stature and the trajectory of her career within and outside OSU, impacting her earning potential.

60. As Dr. Phieffer had warned Defendant Glassman prior to his insistence on hiring Dr. Harrison, her income from Defendant OSU has declined substantially since the hiring of both Dr. Harrison and Dr. Shaikh. Notably, the Plaintiff is the only Trauma Division practitioner whose earnings were initially impacted by Dr. Harrison's retaliatory hire. That is the case because Dr. Phieffer's colleagues were in a "ramp up" status when Dr. Harrison was hired, which means their compensation is guaranteed, rather than based on an earnings formula that takes into account all the practitioners, like Dr. Phieffer's.

61. As further retaliation, Defendant Glassman agreed to a plan that will prevent compensation reductions and protect favorable compensation changes when new practitioners are hired in every division of the Orthopaedics Department except Dr. Phieffer's Trauma Division. When implemented, it will cause a significant loss of income only to the three female members of the Trauma Division—the Plaintiff, Dr. Collins, and Dr. Quatman—while the other two full-time practitioners in the division, who are male, will not be impacted because of their "ramp up" status.

62. Defendant Glassman was aware of the financial and reputational impacts on Dr. Phieffer of each of these actions, including Dr. Phieffer telling him directly about how she would be harmed. He implemented these actions deliberately with intent to adversely impact Plaintiff and further harm her personal well-being and professional reputation in the medical community.

63. Defendant Glassman's discriminatory and retaliatory treatment of Plaintiff is ongoing, creating a hostile work environment in the already highly stressful environment of Trauma Surgery.

64. Defendant OSU has been aware of Dr. Glassman's unlawful behavior for a period of years and has refused to take any effective action to stop it.

## V. FEDERAL CLAIMS FOR RELIEF

### A. DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE IX

65. The preceding paragraphs are hereby incorporated and re-alleged.

66. The discrimination and retaliation against Plaintiff by Defendant OSU constituted sex discrimination by a federally funded educational institution and, therefore, violated Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq.*

### B. DISCRIMINATION AND RETALIATION IN VIOLATION OF THE UNITED STATES CONSTITUTION

67. The preceding paragraphs are hereby incorporated and re-alleged.

68. By discriminating against Plaintiff in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and by discriminating and retaliating against Plaintiff in response to her speech on a matter of great public concern and for raising equal protection concerns, the actions of Defendant Glassman violated the First and Fourteenth Amendments to the United States Constitution, which are actionable pursuant to Title 42 U.S.C. § 1983.

## VI. PRAYER FOR RELIEF

69. WHEREFORE, Plaintiff asks for judgment against Defendants and requests:

   A. Compensatory and punitive damages in an amount to be determined by the jury;

   B. An order reinstating Plaintiff to Chief of the Division of Orthopaedic Trauma and Vice Chair of Clinical Affairs;

   C. The costs of this action, including but not limited to reasonable attorneys' fees;

   D. Pre- and post-judgment interest and compensation for the tax consequences of the delayed payment of the Plaintiff's compensation;

   E. Injunctive relief; and,

   F. Any other relief deemed appropriate by the Court.

Respectfully Submitted,

/s/Jeffrey P. Vardaro
Frederick M. Gittes (0031444)*
*Trial Attorney
Email: fgittes@gitteslaw.com
Jeffrey P. Vardaro (0081819)
Email: jvardaro@gitteslaw.com
**The Gittes Law Group**

723 Oak Street
Columbus, Ohio 43205
Phone: (614) 222-4735
Fax: (614) 221-9655

/s/Laren E. Knoll
Laren E. Knoll (0070594)
(per email authority)
**The Knoll Law Firm, LLC**
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
Telephone: (614) 372-8890
Facsimile: (614) 452-4850
Email: lknoll@knolllaw.com

Attorneys for Plaintiff Laura Phieffer

## JURY DEMAND

The Plaintiffs hereby demand a jury of eight (8) to determine all issues triable by jury in this matter.

/s/Jeffrey P. Vardaro
Jeffrey P. Vardaro (0081819)

19